IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN ANTHONY BUTLER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-07-2103 |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner, Steven Anthony Butler, currently in the custody of the Texas Department of Criminal Justice ("TDCJ"), filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. Butler was convicted of capital murder and sentenced to death for the murder of Velma Clemons during the course of a robbery. This case is before the court on Butler's Amended Petition for Writ of Habeas Corpus (Docket Entry No. 9) and Respondent Nathaniel Quarterman's Motion for Summary Judgment (Docket Entry No. 15). Having carefully considered the Petition, the Summary Judgment Motion, and the arguments and authorities submitted by counsel, the court is of the opinion that Quarterman's Motion for Summary Judgment should be granted, and Butler's Amended Petition for Writ of Habeas Corpus should be denied.

## I.  Background

The facts of the underlying capital crime are not in dispute.
On August 27, 1986, Butler, armed with a handgun, entered a dry
cleaning store and demanded that the cashier give him the store's
money.  The cashier, Velma Clemons, resisted.  Butler threw Clemons
to the floor and shot her to death.  During the penalty phase of
Butler's trial, the State proved that Butler committed seven
extraneous offenses.  See Butler v. State, 872 S.W.2d 227, 231
(Tex. Crim. App. 1994), cert. denied, 513 U.S. 1157 (1995).  The
Texas Court of Criminal Appeals ("TCCA") affirmed Butler's
conviction and sentence, Butler v. State, 790 S.W.2d 661 (Tex.
Crim. App. 1990) (remanding for findings of fact and conclusions of
law on the voluntariness of Butler's confession) and 872 S.W.2d 227
(Tex. Crim. App. 1994) (opinion after remand), and denied Butler's
first state application for habeas corpus, Ex parte Butler,
No. 41,121-01 (Tex. Crim. App. Apr. 28, 1999).

On October 23, 2000, Butler moved this court for appointment
of counsel.  This court appointed counsel on December 21, 2000, and
Butler filed his federal habeas corpus petition on March 1, 2002.
On January 27, 2003, this court dismissed Butler's petition without
prejudice so that he could return to state court to exhaust a claim
that he is mentally retarded and therefore exempt from the death
penalty under Atkins v. Virginia, 536 U.S. 304 (2002).

On June 19, 2003, Butler filed his second state habeas
application raising his Atkins claim and several other claims.  On

-2-

September 15, 2004, the TCCA remanded the <u>Atkins</u> claim to the trial court for findings of fact and conclusions of law and dismissed the remaining claims as an abuse of the writ.   <u>Ex parte Butler</u>, No. 41,121-02, at page 2.   On March 30, 2007, the trial court entered findings of fact and conclusions of law and recommended denying relief on Butler's <u>Atkins</u> claim.   On June 27, 2007, the TCCA adopted those findings and conclusions and denied relief.   The same day Butler filed his federal habeas petition; and on August 30, 2007, he filed an amended petition.

## II.   **The Applicable Legal Standards**

### A.   **The Antiterrorism and Effective Death Penalty Act**

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.   <u>See Lindh v. Murphy</u>, 521 U.S. 320, 335-36 (1997).   Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d); <u>Kitchens v. Johnson</u>, 190 F.3d 698, 700 (5th Cir. 1999).   For questions of law or mixed questions of law and fact adjudicated on the merits in

-3-

state court, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." See Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 534 U.S. 885 (2001). Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" Dowthitt v. Johnson, 230 F.3d 733, 740-41 (5th Cir. 2000), cert. denied, 532 U.S. 915 (2001) (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court

-4-

decision conflicts." Hoover v. Johnson, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), aff'd, 286 F.3d 230 (5th Cir. 2002) (en banc), cert. denied sub nom. Neal v. Epps, 537 U.S. 1104 (2003). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" Id. (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)); see also Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2); Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000), cert. denied, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and

convincing evidence." 28 U.S.C. § 2254(e)(1); see also Jackson v. Anderson, 112 F.3d 823, 824-25 (5th Cir. 1997), cert. denied, 522 U.S. 1119 (1998).

**B.    The Standard for Summary Judgment in Habeas Corpus Cases**

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." Clark v. Johnson, 202 F.3d 760, 764 (5th Cir.), cert. denied, 531 U.S. 831 (2000).  In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, this court may not resolve the facts of the case in the petitioner's favor.  See Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Sumner v. Mata, 449 U.S. 539, 547 (1981).  In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless Butler shows that an exception to 28 U.S.C. § 2254 applies.

### III.  Analysis

Butler's Amended Petition raises 10 claims for relief, but he withdraws three of them (claims 8-10) in his response to respondent's summary judgment motion.  The remaining seven claims are addressed below.

### A.  Statute Of Limitations

As a threshold matter, respondent argues that all of Butler's claims, with the exception of his Atkins claim, are time-barred. Under the AEDPA a state prisoner has one year in which to file a federal habeas corpus petition.  Fierro v. Cockrell, 294 F.3d 674, 679 (5th Cir. 2002), cert. denied, 538 U.S. 947 (2003).  Because petitioner's conviction became final before the effective date of the AEDPA, the one-year statute of limitations began to run on the AEDPA's effective date, April 24, 1996.  Id.

The parties agree that Butler filed his federal petition after the one-year statute of limitations expired.  Butler contends that he is entitled to equitable tolling; respondent disagrees.

This court addressed this issue in an Order entered on May 8, 2002, in connection with Butler's first federal petition.  The full analysis will not be repeated here, but that Order explains that Butler's state habeas counsel abandoned his representation upon the conclusion of Butler's state habeas proceeding, notwithstanding his state statutory duty to file a motion in federal court for appointment of federal habeas counsel.  See TEX. CODE CRIM. PROC. art. 11.071(2)(e).  In essence, the court found that this, in

combination with substantial evidence that Butler was mentally ill and therefore impaired in his ability to find his own counsel or seek appointment of counsel in this court, constituted the rare and unusual circumstances justifying equitable tolling of the limitations period. See Butler v. Cockrell, No. H-01-75 (S.D. Tex. May 8, 2002). Because the court has already determined that Butler is entitled to equitable tolling, his petition is not time barred.

**B.   Mental Retardation**

In his first claim for relief, Butler contends that the Eighth Amendment bars his execution because he is mentally retarded. While the Supreme Court, in Atkins v. Virginia, 536 S.Ct. 304 (2002), held that a state may not execute a mentally retarded offender, the Court did not adopt a particular definition of mental retardation. Because the Texas legislature has yet to adopt a definition of mental retardation for Atkins purposes, the Texas Court of Criminal Appeals adopted the standards of the American Association of Mental Retardation ("AAMR") and of Texas's Persons With Mental Retardation Act, TEX. HEALTH & SAFETY CODE ANN. § 591.003(13). See Ex parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004). Under these standards a diagnosis of mental retardation requires (1) significantly sub-average intellectual functioning, (2) deficits in adaptive functioning, and (3) onset before age 18.[1]

---

[1] The Supreme Court cited this definition with approval in Atkins, 536 U.S. at 309 n.3.

The state court held a seven-day evidentiary hearing on Butler's <u>Atkins</u> claim.  The court issued 48 pages of Findings of Fact and Conclusions of Law.  The court concluded that Butler does not have significantly sub-average intellectual functioning or deficits in adaptive functioning.  Because it concluded that Butler suffered from neither of these deficits, it also concluded that there was no onset before age 18.  Butler now challenges the state court findings of fact and conclusions as unreasonable in light of the evidence presented.

1.   <u>Significantly Sub-average Intellectual Functioning</u>

The AAMR defines significantly sub-average intellectual functioning as "an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  <u>Briseno</u>, 135 S.W.3d at 7 n.24.

a.   State Court Findings

The state court made the following findings.

Dr. George Denkowski, who holds a Ph.D. in counseling psychology, evaluated Butler at the request of the Respondent. Dr. Denkowski administered the Test of Memory Malingering, Wechsler Adult Intelligence Scale, 3d edition ("WAIS-III"), Dot Counting Test, Rey 15-Item Memory Test, Structured Interview for DSM-IV Axis I disorders, Clinical Version (Psychotic and Associated Symptoms section only), Beck Anxiety Inventory, Beck Depression Inventory, Second Edition, Wide Range Achievement Test-Third

Edition, and the Adaptive Behavior Assessment System. Dr. Denkowski also reviewed numerous documents including Butler's petition for post-conviction relief, a psychoeducational report by Dr. Denis Keyes, a transcript of Butler's testimony at his trial on a charge of sexual assault, educational records from Butler's school years in Mississippi, TDCJ records, military records, Harris County Sheriff's Department Records, and Dr. Keyes' protocols. ¶¶ 40-42. IV SH at 923-24.[2]

Dr. Denis Keyes, who holds a Ph.D. in special education, evaluated Butler at Butler's request. He administered the WAIS-III, Woodcock-Johnson Psychoeducational Battery-Third Edition, and the Independent Living Scales. ¶¶ 43 and 44. Id. at 924-25.

Based on Dr. Denkowski's affidavit, the court found that Butler attained Bs in all subjects in fourth grade and that Butler's academic performance indicated normal learning ability through age 10. The court characterized this finding as "highly contraindicative of mental retardation." ¶ 46. Id. at 925. The court also found that Butler possessed "modest mental ability" requiring him to put forth more effort than most students to achieve the grades he did. This effort is reflected by his fourth-grade teacher giving him a 2 on a scale of 1-to-5 for "assumes responsibility," where 1 indicates high effort and 5 indicates low

---

[2]"SH" refers to the record of Butler's state habeas corpus proceeding. The "¶" references are to the state court's Findings of Fact and Conclusions of Law.

effort.  The court also found that Butler received Cs and Ds in middle and high school, but that he was not placed in special education.  The court noted that Butler manifested little interest in school by ninth grade, receiving a 5 for "assumes responsibility" that year.  Butler received his GED in 1983.  The court accepted Dr. Denkowski's conclusion that Butler began exhibiting behavioral problems in fifth grade and started using alcohol at age 12 and drugs at age 14, and that these affected Butler's academic performance.  Dr. Denkowski also opined, and the state court found, that Butler became disengaged from his education by ninth grade and that nothing in Butler's academic records indicated a need for special education.  ¶¶ 46 and 48.  Id. at 925-26.

Based on Dr. Denkowski's testimony, the court found that Butler's poor education and low reading, spelling, and arithmetic abilities suppressed his verbal IQ score.  ¶ 50.  The court also accepted Dr. Denkowski's statement that a low IQ score could be a testing anomaly resulting from an individual's poor test-taking ability.  ¶ 52.  Id. at 927.

The state court found, based on testimony by Butler's schoolmates, Walter Washington, Cynthia Minor, Amanda O'Quinn, and Jerlian King, that Butler put forth little effort in class, did not discuss the work or participate in class, did not do homework, stated that he did not need help with his homework, and was not in

special education even though such classes were available in Butler's school district. The court also noted that Ms. Minor is now herself an educator and would, based on her training, refer Butler for testing. George Smith, a school principal, testified that Butler's score of 5 on "Assumes Responsibility" meant that Butler was not a good student, was not attentive in class, and did not do his homework. Based on this, the court found that Butler was minimally engaged in school. ¶¶ 53-57. Id. at 927-28.

The court found that both Dr. Denkowski and Dr. Keyes administered tests to determine if Butler was anxious or depressed and if he was exerting good effort, and both experts agreed that Butler did not suffer from meaningful depression or anxiety and that he did put forth good effort. The court also noted that the manual for the WAIS-III cautions that "a low score on the WAIS-III does not necessarily reflect a low level of intellectual functioning." ¶¶ 60 and 61. Id. at 928-29.

The court found, based on the testimony of both experts, that Butler took both the Short Form Test of Academic Aptitude ("SFTAA") and the Otis-Lennon Mental Ability Test in school. Both experts agreed that neither is a test of general intellectual functioning, but are estimates of academic learning ability, and are therefore not valid indices of mental ability. The court found that although the SFTAA is not a measure of general intellectual function, Butler's performance on the SFTAA was consistent with that of a

student with a full-scale IQ of 80 and that this level of achievement would be highly unusual for a mentally retarded ninth grader.  ¶¶ 62-64.  Id. at 929.

Butler took the Wechsler Intelligence Scale for Children ("WISC") in 1974 when he was 11 years and nine months old and obtained a full-scale IQ of 80.  The court found that this result, which was corroborated by Butler's scores on the SFTAA, demonstrated that Butler did not have significantly sub-average intellectual functioning during his developmental period.  ¶¶ 65 and 66.  The court acknowledged that Butler argued that his score must be adjusted to account for the "Flynn Effect," the phenomenon that the IQ tests of a population rise as the test ages.[3]  The court credited Dr. Denkowski's testimony that the Flynn Effect cannot be applied to all old WISC scores, but that the extent to which a score is inflated varied and must be determined on a case-by-case basis.  ¶ 69 at 930-931.  The court also found that Butler exerted inconsistent effort, based on the fact that he got some purportedly easy questions wrong but got harder questions right.  ¶ 70.  Id. at 931.

Based on the testimony of one of Butler's teachers, the court found that Butler was referred for a special education assessment

_____

[3]Butler argued that his WISC score should be reduced by 8 points, based on professional literature calling for a .3 point adjustment for each year the test is used after it was last normed and the fact that the WISC was 26 years old when Butler took it in 1974.

when he was 11 years old.  The teacher testified that she could not recall her specific reasons for doing so, but would not have done so lightly because it entailed a lot of paperwork.  ¶ 72.  The Mississippi schools classified Butler as "educable mentally retarded," but the court found that this was not a reliable indicator of mental retardation because the schools used such classifications for administrative purposes, and the classification might have been unrelated to clinical diagnostic criteria.  Butler was never placed in special education, and Dr. Denkowski testified that he found nothing in Butler's records to warrant placement in special education.  ¶ 73.  Id. at 931.

Dr. Keyes administered the WAIS-III in 2003, and Butler obtained a full-scale IQ of 72.  ¶ 74.  Id. at 932.  Dr. Keyes also administered the Woodcock-Johnson Psychoeducational Battery.  The court found that the Woodcock-Johnson battery produces a full-scale clustered score that is interpreted in the same way as a conventional IQ score.  Butler scored 89 in Oral Language, 83 in Broad Reading, 94 in Math Calculation Skills, 84 in Academic Skills, 79 in Academic Fluency, 80 in Letter Word Identification, 85 in Reading Fluency, 96 in Story Recall, 88 in Understanding Directions, 94 in Calculation, 94 in Math Fluency, 88 in Spelling, 79 in Writing Fluency, and 90 in Passage Comprehension.  The court found that Butler's scores indicate that he is functioning at a much higher level than a person with a full-scale IQ of 70.  The court found that Butler's Woodcock-Johnson scores indicate that his

general intellectual functioning is not significantly sub-average. ¶¶ 75 and 76.  Id.

Dr. Denkowski testified that Butler could tell time from a watch with no numbers on its dial and could correctly state his social security number despite being incarcerated for 20 years, and that these are highly atypical skills for a mentally retarded person. ¶ 80.  Id. at 933.  Dr. Denkowski also administered three tests of effort and malingering and decided that Butler was not malingering and was putting forth full effort.  ¶ 81.  Id.  He then administered the WAIS-III in August of 2006 and obtained a full-scale IQ of 69.  Dr. Denkowski testified that he did not believe this score was an accurate measure of Butler's true IQ and that the WISC score of 80 obtained when Butler was 11 years old was more accurate.[4]  Dr. Denkowski estimated Butler's IQ in the borderline normal range of 70 to 85.  He also testified that the WAIS-III is not impacted by the Flynn Effect because there is no more recent version of the test and that the developers of the WAIS-III do not recommend correcting scores to account for the Flynn Effect.  ¶¶ 81 and 82.  Id. at 932-34.  Dr. Denkowski derived an IQ score of 80 from the Perceptual Organization Index ("POI"), which uses only three of the eleven sub-tests on the WAIS-II.  The court found that Butler's POI of 80 is a more accurate indicator of how Butler

---

[4]Dr. Denkowski also testified that Butler's verbal IQ scores were artificially low based on his poor education-based skills in reading, spelling, and arithmetic.  ¶ 50; id. at 927.

functioned in the community than his full-scale IQ of 69.  ¶¶ 85-87.  Id. at 934-35.

The court found Dr. Denkowski's opinion to be credible and concluded that Butler's WAIS-III scores do not establish significantly sub-average intellectual functioning, based on Butler's "nonverbal mental facility and proficiency in academic skills."  ¶ 89.  Id. at 935.  The court also concluded that the WAIS-III score understates Butler's actual mental ability because of Butler's poor performance in school, behavior problems, and poor test-taking skills.  Therefore, the court concluded that Butler did not establish that his general intellectual functioning was significantly sub-average before or after age 18.  Id. at 935-36.

   b.   Analysis

Butler's primary criticism of the state court's failure to find that he suffered from significantly sub-average intellectual functioning before the age of 18 is based on the state court's failure to apply the Flynn Effect to his IQ test scores.  All experts testified about the tendency of IQ test scores to rise over time after the test has been developed because of subsequent increases in the education and sophistication of the population taking the test.  One exponent of such inflation is James R. Flynn.[5]

_____

   [5]Flynn's article, "Tethering the Elephant, Capital Cases, IQ and the Flynn Effect," published in Psychology Public Policy and Law in 2006, Def. Exh. 31 was the subject of frequent questioning of the experts.

Butler called as a rebuttal witness Dr. Jack Fletcher, a
Distinguished University Professor of psychology at the University
of Houston.  Dr. Fletcher testified that he specializes in assess-
ment of children with developmental disabilities, including mental
retardation.  The Flynn Effect, i.e., the score inflation, is about
.3 points per year, or 3 points per decade.  Dr. Fletcher explained
that it is important to compare tests given at different times to
a common source of norms.  He testified that both the existence of
the Flynn Effect and the figure of .3 points per year are generally
accepted within the psychological community.  8 WH at 14-16.[6]
Dr. Denkowski also acknowledged the fact of the Flynn Effect, but
testified that the adjustment should only be .13 points per year.
According to Dr. Denkowski, Butler's score of 80 on a WISC test
taken in 1974 should be reduced by 3 points to 77 to account for
this inflation factor.  State's Exh. 43.  Dr. Keyes testified that
this score should be reduced by 8 points to 72.  8 WH at 83;
State's Exh. 43.  Dr. Denkowski disagreed with Dr. Keyes that
Butler's score of 72 on the WAIS-III test taken in 2003 should be
reduced for inflation because the rate at which the WAIS-III IQ
scores have inflated since the WAIS-III was last normed in 1995 has
not been established.  8 WH at 83-85; State's Exh. 44.

Dr. Fletcher testified that he was not aware of any research
supporting Dr. Denkowski's inflation adjustment of .13 per year

---

[6]"WH" refers to the transcript of the writ hearing conducted
by the state court.

instead of .3 per year on the WISC test.  8 WH at 26.  Dr. Fletcher testified that the research Dr. Denkowski cited, by Dr. Alan Kaufman, stated that any WISC score obtained after the revised form of the WISC (or WISC-R) was released should be discounted by 5 to 7 points.  8 WH at 19-20.  Dr. Kaufman's statement was published in 1979, before publication of the Flynn Effect.  In a 1994 follow-up to his 1979 book, Dr. Kaufman described the Flynn Effect as an "uncontestable truth."  8 WH at 23.  Dr. Fletcher's opinions about the application of the Flynn Effect to Butler's IQ test scores are summarized in Def. Exh. 42.[7]

Based on the fact that the WISC was normed in 1947 or 1948 and Butler took it in 1974, Dr. Fletcher adjusted Butler's 1974 score to 72.2 (1974 minus 1948 = 26 years x .3 points per year = 7.8 points.  80 minus 7.8 = 72.2).  8 WH at 29.  Adjusting all three tests against a 1995 norm for the WAIS-III (the most recent year that the WAIS was published), Dr. Fletcher arrived at adjusted scores of 65.9 on the 1974 WISC test, 65.7 on the WAIS-III test administered in 2006 by Dr. Denkowski, and 69.6 on the WAIS-III test administered in 2003 by Dr. Keyes.  9 WH at 30-36; Def. Exh. 42.  Based on these calculations Dr. Fletcher concluded that all three of Butler's IQ tests were within the 95% confidence interval for mental retardation.  8 WH at 34-36.

---

[7]Anyone trying to understand the record of the writ hearing would be advised to have a copy of Def. Exh. 42 and Def. Exh. 6 (Butler's school records) before them while reading the record of the hearing.

Respondent, citing three cases, argues that the Fifth Circuit and the Texas Court of Criminal Appeals have not accepted the scientific validity of the Flynn Effect.  In <u>In re Salazar</u>, 443 F.3d 430 (5th Cir. 2006), the court reviewed an <u>Atkins</u> claim in which the petitioner obtained a full-scale IQ of 87 on the WAIS-R. His expert witness stated in a declaration that the score should be discounted for the Flynn Effect.  The expert, however, "does not indicate what effect it would have had on Salazar's score in particular or even whether it is appropriate to adjust an individual's score based on this theory."  <u>Id.</u> at 433.  The Fifth Circuit expressly stated that it neither accepted nor rejected the validity of the Flynn Effect because the evidence in that case did not make necessary any such determination.

> Even assuming that the Flynn Effect is a valid scientific theory and is applicable to Salazar's individual I.Q. score -- and we express no opinion as to whether this is actually the case -- Salazar's score readjusted to account for score inflation is still above the cutoff for mental retardation.

<u>Id.</u> at n.1.

In re Mathis, 483 F.3d 395, 398 n.1 (5th Cir. 2007), merely cites <u>Salazar</u> for the proposition that "[t]he Flynn Effect . . . has not been accepted in this Circuit as scientifically valid," but does not reject the theory as scientifically invalid.  In <u>Ex parte Blue</u>, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007), the court described the Flynn Effect as "an unexamined scientific concept

. . . .," but also stated that "[t]his Court has never specifically addressed the scientific validity of the Flynn Effect.  Nor will we attempt to do so now."  <u>Id.</u>

Since respondent points to no controlling precedent either accepting or rejecting the scientific validity of the Flynn Effect, this court is left with the evidentiary record in this case.  All three experts acknowledged that the Flynn Effect is generally accepted in the psychological community.  Their dispute concerned the number of points by which a score must be discounted to account for the effect.  On this point the literature did not support Dr. Denkowski's reduced discount factor, and did support Dr. Fletcher's discount of 3 points per decade.

Dr. Fletcher also testified that Dr. Denkowski's reliance on the POI is unsupported by the professional literature.  See 5 WH at 60-65; 9 WH at 37-41.  (The state  court relied on this testimony and found that Butler's POI score was a more accurate indicator of how Butler functioned in the community than his WAIS full-scale IQ of 69.  ¶ 87 at 935.)  Dr. Fletcher explained that

> the [POI] scores are based on fewer items. They have much higher standard errors of measurement and, therefore, they are inherently less reliable than full-scale and, in turn, less reliable than just, say, using verbal IQ or performance IQ.

<u>Id.</u> at 39.  On cross-examination Dr. Denkowski conceded that the AAMR states that a full-scale IQ score is the best "index of measured intelligence" to use in assessing the intellectual

functioning prong of mental retardation, although he believes that it is not necessarily the best index of how a person actually functions.  7 WH at 88-90.

Dr. Fletcher testified that Butler's scores on the Woodcock-Johnson battery is not a valid basis for questioning the accuracy of Butler's full-scale IQ scores.  8 WH at 53-55.  The state court relied on Dr. Denkowski's testimony concerning Butler's Woodcock-Johnson scores to reject reliance on his full-scale IQ scores in determining that Butler's functional intelligence was not "significantly sub-average."  ¶ 77 at 932.  See also ¶¶ 75 and 76. Id.

Dr. Denkowski conceded that it is improper to derive an IQ from achievement test scores.  7 WH at 109-10.  Dr. Denkowski also conceded that a mentally retarded person "by their late teens . . . can acquire academic skills to approximately the sixth grade level."  Id. at 112.  Dr. Fletcher testified that Dr. Denkowski's belief that a mildly mentally retarded person could not obtain the achievement test scores obtained by Butler has been proven wrong and is based on outmoded theories.  9 WH at 42-49.

In making its findings as to Butler's intellectual functioning the state court found that Butler's IQ scores were not "accurate representations of [his] intellectual functioning in light of [his] proficiency in academic skills."  ¶ 88 at 935.  The court found that Butler's academic performance indicated normal learning ability through age 10, which was "highly contraindicative of

mental retardation." ¶ 46 at 925.  While the state court's finding that Butler's grades showed normal learning in the fourth grade is supported by the record,[8] the record does not support the state court's broader finding that he showed normal learning through age 10.  The record shows that Butler received marginal grades in second and third grade, rebounded to a B average in fourth grade, performed at an average level in the fifth grade and declined from the sixth grade on.  WH Def. Exh. 6.

The state court's finding based on Dr. Denkowski's testimony that the drop off in Butler's academic performance began in the fifth grade and was affected, beginning at age 12, by substance abuse, ignores Butler's marginal grades in second and third grade.  It also ignores the testimony of Sibyl Strozier, the teacher who referred Butler for a special education assessment in sixth grade, that she would not have made the referral based on lack of motivation.  "It had to have been something serious."  4 WH at 66.  Ms. Strozier explained that a special education referral "was a very long and drawn-out process.  It was not something that a teacher went into lightly because it required . . . quite a lot of paperwork."  Id. at 59.  One of Butler's classmates, who is now herself an educator, testified that the special education program

---

[8]The transcript of Butler's elementary school grades shows that he received grades ranging from the mid-60s to the mid-70s in second grade, and the low-60s to the mid-70s (with one 80) in third grade.  He received straight Bs in fourth grade, but began receiving many Cs in fifth grade, and received no grade above C in sixth grade.  Def. Exh. 6.

then in place was primarily for children with obvious handicaps such as Down's Syndrome.  2 WH at 43-44.

This court appreciates the difficult task faced by the state trial court in parsing through the often-disputed testimony of competing experts to determine whether Butler is mentally retarded. The court is nevertheless concerned whether the state court, although it correctly identified the governing legal rule, unreasonably applied that rule to the facts of this case in determining that Butler did not have sub-average general intellectual functioning before the age of 18.  The state court's finding that he did not is based almost entirely on the opinions of Dr. Denkowski and the trial court's acceptance of Dr. Denkowski's analysis of the evidence.  After giving every deference to the trial court's assessment of the credibility of witnesses, the court is concerned that an objective view of the evidence may not support Dr. Denkowski's opinions.

First, Dr. Denkowski's opinions regarding the applicability of the Flynn Effect to Butler's 1974 WISC score of 80 are not supported by other, credible, evidence.  Although Dr. Denkowski testified that the adjustment for inflation on Butler's IQ test should only be .13 per year, he presented no scholarly support for this opinion, which he testified was based on an analysis of a "special population."  His opinion was rejected by Butler's retained expert, Dr. Keyes, and by Dr. Fletcher, and by the weight of the scholarly evidence.  Dr. Denkowski's reliance on a .13 per

-23-

year adjustment was also contradicted by his own prior reliance on Flynn's recommended adjustment of .3 per year to support a finding of mental retardation in another case. Dr. Fletcher testified that to account for score inflation Butler's score of 80 on his WISC taken in 1974 should be adjusted either to 72.2 or 65.9, that the WAIS-III he took in 2003 should be adjusted to 69.6, and that the WAIS-III that he took in 2006 should be adjusted to 65.7. These scores are all close to or below the 70 required to establish mental retardation and, using the 95% confidence interval, all indicate mental retardation.

The record also leaves doubt as to the correctness of the state court's reasons for discounting Butler's low scores on the 2003 and 2006 WAIS-III tests. Butler's Woodcock-Johnson scores are not a reliable basis for rejecting a full-scale IQ score. The POI relied upon by Dr. Denkowski is not as valid an indicator of IQ as a full-scale IQ score. Butler did not demonstrate normal learning through age 10. His one normal year in the fourth grade was an aberration from an otherwise abysmal elementary school record.

In sum, the trial court's failure to find that Butler satisfied the first criteria for mental retardation was based almost entirely on the court's acceptance of Dr. Denkowski's heavily disputed opinions. Because Dr. Denkowski was qualified as an expert in mental retardation, and since his testimony supports the state court's findings, this court concludes that Butler has not shown by clear and convincing evidence that the state court's

findings are incorrect.  Nevertheless, the court concludes that a certificate of appealability should issue on this question.  Butler has made a substantial showing that another court could resolve this issue differently and that the issue is suitable enough to deserve appellate review by means of a certificate of appealability.

### 2.  Deficits In Adaptive Functioning

To support a finding of mental retardation Butler must also demonstrate significant deficits in adaptive functioning and onset of these deficits and his low IQ before the age of 18.  To satisfy the adaptive functioning requirement Butler must demonstrate significant limitations in at least one of three major domains, or two of 11 subcategories, of adaptive functioning.  The three major domains are (1) conceptual, which covers communications skills, money concepts, and self-direction; (2) social; and (3) practical, which includes daily living activities and occupational and health and safety skills.  The 11 subcategories are  communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, health, safety, functional academics, leisure, and work.  DSM-IV-TR at 41.[9]

---

[9]Butler argues that the respondent incorrectly analyzed Butler's adaptive behavior on the basis of seven factors identified by the Court of Criminal Appeals in Ex parte Briseno, 135 S.W.3d 1, 8-9 (Tex. Crim. App. 2004), and that the Briseno factors should not be considered because they are not entirely consistent with the
(continued...)

a.   State Court Findings

The state court made the following findings with regard to Butler's adaptive functioning.

Butler gave the police several written statements confessing to capital murder and a number of extraneous offenses.  He recalled details of the offenses and conveyed facts in chronological order. The court found that this showed Butler's ability to carry out complex criminal plans.  ¶ 94, IV SH at 936-37.

Butler understood the legal warnings given to him by the police, spoke clearly, and communicated well; he was able to recount details of his crimes and relayed information in a chronological way; he admitted to reading newspapers; and he did not have diminished mental capacity.  ¶ 95, IV SH at 936-37.

Butler testified on his own behalf during his trial for aggravated sexual assault and communicated effectively.   He understood and responded logically and appropriately to questions and devised a story of mistaken identity and coercion in his defense.   Based on his confessions Butler had the ability to formulate and follow through with criminal plans, including evaluating potential targets and returning later to commit the

---

[9](...continued)
areas of adaptive behavior specified in the professional literature on mental retardation.   The <u>Briseno</u> factors, however, overlap the areas of adaptive behavior set out in the literature and Butler's petition.   The state court's analysis of the <u>Briseno</u> factors will be considered insofar as they correspond to the relevant categories set out in Butler's petition.

crime.  He showed the ability to lead by giving orders to his victims and by bringing a weapon to commit the offense.  Butler could appreciate the wrongfulness of his actions, as demonstrated by changing the license plates on his car after a capital murder and attempting to evade arrest.  ¶¶ 96-99.  Id. at 937-38.

Butler's mother testified during the penalty phase of the trial that Butler was always attentive and was an average student. Butler worked as a plumber after successfully completing Job Corps training.  He stayed in close contact with his family.  ¶ 100.  Id. at 938.

Butler's father testified at trial that Butler was trustworthy.  He did normal things like going to the movies, was active in the community, could drive, corresponded with his father, and received an honorable discharge from the military.  ¶ 101.  Id. at 938.

During the punishment phase of his trial several of Butler's friends and relatives testified to Butler's generally good character.  None of them testified that they thought Butler was mentally slow or retarded.  Several people testified that, as a child, they considered and treated Butler as a normal boy.  ¶¶ 104-109.  Id. at 939-40.

During the Atkins hearing Butler's father testified that teachers told him that Butler was getting bad grades and needed to improve his homework.  He stated that he was not referring to

-27-

Butler's mental abilities when he testified at trial that Butler was normal, active, and trustworthy. ¶ 109. Butler's father also testified, however, that Butler had a car from the time he was 16 or 17 years old and was a good driver, that he understood and obeyed traffic rules, and was active in the community. Butler performed errands for elderly people, could remember a list of items he needed to purchase, could read a grocery list, could use a power lawn mower, and had to memorize plays. Butler was paid for the work he did. He was a good athlete. Butler's father had no concerns about Butler moving away and caring for himself. ¶ 110. Id. at 940.

Walter Washington testified that he had a class with Butler in sixth grade and that Butler put no effort into his school work. He characterized Butler as a follower and said that Butler had no chores at home. He also stated that other students called Butler "slow" and "dumb" because he did not answer questions in class. Washington acknowledged that he saw Butler only once after eighth grade, that the class they took together was not a special education class, and that Butler attended class, arrived on time, and was well groomed and wore clean clothes. He also acknowledged that he did not know why Butler did not try in school. ¶¶ 113 and 114. Id. at 940-41.

Cynthia Minor was Butler's friend in high school. They took a tenth-grade history class together. Minor never saw Butler turn

in homework, he did not participate in class, and he became belligerent if asked about his lack of class participation. Minor testified that Butler could engage in conversation and responded appropriately to questions. ¶¶ 115 and 116. Id. at 941.

Anthony Minor became friends with Butler in junior high school. He testified that Butler had a limited vocabulary. He also testified that Butler was an average kid, could drive, and completed Job Corps training and received a plumbing certificate. Butler moved to Houston and lived with Minor for several months. Minor helped Butler fill out a job application. Butler got a job with AMF Tubascope doing physical labor. Minor also helped Butler get a car. Butler would not clean up the apartment unless Minor asked him to do so. Butler mostly bought prepared foods to eat and dropped off his laundry for washing at a laundromat. Minor helped Butler get his own apartment and financed Butler's purchase of furniture for the apartment. ¶ 117 at 941-942.

Minor did not go to Butler's apartment every morning to help him get ready for work and did not pay Butler's rent. Butler took care of his own personal hygiene and grooming. Minor conceded that it was possible that Butler did not clean up because he was lazy. Minor thought that Butler could live on his own. He conceded that Butler knew how to use the oven, saved enough money to buy a car, had a driver's license, and could follow traffic rules. Minor was also unaware of Butler's drug and alcohol abuse and criminal activity. ¶ 118 at 942.

-29-

Another of Butler's friends, Barbara Buie, testified that Butler drove.  When they went out to eat, Butler asked her to order food for him.  Butler was in a school job program, but was always assigned to clean the hallway with a dust mop while other participants were assigned to more skilled jobs.  Butler could buy his own snacks and could make jokes.  Buie acknowledged that Butler was always groomed, that she was unaware that he served in the National Guard or got his GED, and was not afraid to ride in a car when Butler drove.  Butler understood jokes and responded appropriately.  Butler was very quiet, but there was nothing about him that led Buie to believe that he could not live on his own. ¶¶ 119 and 120.  Id. at 942-43.

Amanda O'Quinn was Butler's high-school girlfriend.  They dated for three years and were engaged.  She and Butler met in summer school.  Butler joked a lot and was evasive when talking about serious topics, such as their future together.  Butler acted as the class clown and did not pay attention in class.  O'Quinn acknowledged that Butler was aware of current fashions.  He responded appropriately when she asked him if he loved her.  She was willing to marry him and have children with him.  ¶¶ 121 and 122.  Id. at 943.

The court found that Butler was never placed in special education and that his family and friends neither considered nor treated him as mentally retarded.  The court also found that Butler held several jobs, including work in a school program performing

maintenance, the Army National Guard, a laborer for Universal Tubing and AFL Tubascope, and a plumber's helper.  ¶¶ 123-126.  Id. at 943-44.

The court found that Butler joined the Army National Guard in 1981 and successfully completed basic training in 1982.  He received training in the use of an M-16 rifle and hand grenades. Basic training required listening to and following instructions, learning how to fire, clean, assemble and disassemble a firearm, keeping his uniform orderly, and keeping his bunk area clean and neat.  Butler wrote a coherent note to his commanding officer explaining why he missed National Guard duty.  Butler received a GED in 1983.  ¶¶ 127-129 at 944.

A search of Butler's death row cell found newspaper articles relating to the death penalty; magazines, including Slam, ESPN, Men's Journal, The Sporting News, and Jet (the court specified that all but Jet were addressed to Butler); several books, including a Bible; numerous pamphlets and newsletters, including religious and anti-death penalty publications; three manila envelopes with a Houston Chronicle return address; a copy of the TDCJ-ID commissary price list; filled out commissary order slips; writing pads and stationery; sales receipts from the commissary; a 2005 calendar modified for use in 2006; and photos and correspondence.  The search also found the following self-care and personal items: non-aspirin packets, tablespoon, toothbrush, soap, toilet tissue, cleansing powder, coffee cups, Coca Cola, earplugs, deodorant,

hairbrush, soap dish, shampoo, cotton swabs, toothpaste, hair pomade, baby oil with vitamin E, cocoa butter lotion, eye drops, toothbrush case, mirror, comb, packets of salt and pepper, a bowl, a jar of mustard, two pairs of slippers, and brown paper sacks. Based on these items, the court found that Butler was functional in the adaptive skill areas of health and safety, self-care, home living, community use, social and communication.  ¶¶ 130-133.  Id. at 944-46.

Based on the signed commissary order slips, a list of purchased items, and testimony that it would be very difficult and unlikely for a death row inmate to receive assistance in ordering from the commissary, the court found that Butler ordered numerous items from the commissary without exceeding the limit on allowed items or overdrawing his inmate trust account.  The court also found that Butler completed commissary order forms, correctly filling out the forms and calculating the costs of multiple units of ordered items.  ¶¶ 134-139 at 946-948.  Based on this, the court found that Butler demonstrated competence in the adaptive skill areas of self-care, community use, and functional academics.  ¶ 140 at 948.

The court found that Butler's TDCJ health records showed that he was not mentally retarded and was functioning at an average intellectual level.  He was able to explain the meaning of proverbs, such as "birds of a feather flock together."  An administration of the Minnesota Multiphasic Personality Inventory

in 1996 resulted in an invalid and uninterpretable profile.  This
suggested that Butler was "overendorsing" symptoms of mental
disorders.  ¶ 141 at 948.

Butler displayed a tendency, early in his stay on death row,
to act out, but his speech and thought processes were normal.  TDCJ
records consistently documented Butler's neatness and cleanliness
in grooming and cell maintenance.  The court found that Butler
possessed the adaptive skills of lying for secondary gain, self-
care, and home living.  ¶¶ 142-145.  Id. at 948-49.

The court found that Dr. Keyes tried to administer the Scales
of Independent Behavior - Revised Edition, but Butler "shut down"
and did not complete much of the test.  Dr. Keyes then administered
the Vineland Adaptive Behavior test to Butler's friends Barbara
Buie and Anthony Minor by telephone.  Based on Minor's responses,
Dr. Keyes scored Butler with a 30 in communication, 53 in daily
living, 40 in socialization, and a composite score of 39.  Based on
Buie's responses, Dr. Keyes scored Butler with a 30 in
communication and 46 in socialization.  The court found that
Butler's composite score of 39 was equivalent to an IQ score of 39,
which would make Butler severely mentally retarded, and that a
diagnosis of severe mental retardation is inconsistent with
Butler's demonstrated abilities and accomplishments in numerous
areas.  Accordingly, the court rejected Dr. Keyes' assertion that
Butler has deficits in adaptive behavior.  Id. ¶¶ 146-151 at 949-
50.

The court found that Dr. Denkowski interviewed Butler in August of 2006.  Butler appeared to understand the examination procedure and answered questions and communicated appropriately. Dr. Denkowski administered the Adaptive Behavior Assessment Scale ("ABAS").  The court found that neither this test nor the Independent Living Scales administered by Dr. Keyes was designed to assess the abilities of a person who has been incarcerated for a substantial length of time.  Accordingly, the court did not consider the results of either test.  ¶¶ 152 and 153.  Id. at 950-51.

The court found that Dr. Fletcher did not administer any tests of adaptive behavior.  The court therefore found unpersuasive any assertions by Dr. Fletcher that Butler possesses deficits in adaptive behavior.  ¶¶ 154 and 155.  Id. at 951.

The court noted that the Texas Court of Criminal Appeals identified a number of additional factors that courts can consider in determining whether a petitioner is mentally retarded:  (1) did those who knew the person best during the developmental stage think he was mentally retarded and act accordingly; (2) has the person formulated plans and carried them through or is his conduct impulsive; (3) does his conduct show leadership or does it show that he is led around by others; (4) is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable; (5) does he respond coherently, rationally,

and on point to oral or written questions or do his responses wander from subject to subject; (6) can the person hide facts or lie effectively in his own or others' interests; and (7) did the commission of the offense require forethought, planning, and complex execution of purpose.  See Ex parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  ¶ 156.

Considering the Briseno factors, the court found that those who knew Butler best during his developmental period did not consider him mentally retarded; that Butler is able to formulate and carry through plans for living, such as joining Job Corps, getting his own apartment, and engaging in complex criminal activities; that he was able to choose a business to rob, determine when there would be a substantial amount of money and few people on the premises, bring a gun with him, and give orders to his victims, and that there is no indication that others assisted him; that Butler had the ability to hide facts or lie in his own interest, as evidenced by his changing the license plates on his car, claiming mistaken identity and police coercion, and feigning mental illness in prison; that he exhibited rational and appropriate conduct by changing his license plates, shooting at a police officer to evade arrest, and making appropriate responses to law enforcement officials and attorneys during legal proceedings; and that Butler responded coherently and rationally to questions.  ¶¶ 157-162.  Id. at 952-53.

The court concluded that Butler failed to demonstrate deficits in adaptive behavior.  The court based this conclusion in part on Butler's employment history, his attempts to escape detection for his crimes, his interactions with others, his ability to live by himself, his ability to carry out complex robberies, his ability to testify on his own behalf, and his interactions with police. ¶¶ 163 and 164.  Id. at 953.

### b.   Analysis

Butler argues that the state court's findings were unreasonable in light of the evidence presented.  For the reasons explained below, the court concludes that the state court's findings concerning Butler's alleged deficits in adaptive behavior are reasonably supported by the record.

### (1)  Conceptual Skills

In support of his claim that he has a significant general deficit in conceptual skills, Butler cites excerpts from videotaped interviews he gave to Dr. Denkowski and his response to the court when questioned about his desire to change counsel.  His responses are often one-word answers, sometimes monosyllabic, and are sometimes barely, or not at all, coherent.  See Am. Pet. at 26-35. Butler argues that the state court ignored this evidence.

This evidence does not help Butler as much as he contends. While Butler's responses to the court and to Dr. Denkowski suggest a person with limitations in communicating, these events occurred

long after Butler's developmental period ended and after a lengthy period of incarceration.  They also occurred after the onset of what Butler argues is severe mental illness.[10]  Moreover, Butler was able to testify coherently at his state trial in Chambers County, not in one-word answers, and was able to recount in considerable detail recent events and explain his conduct in a reasoned manner. State Exh. 19 at pp. 510-516, 5 WH at 182-188.  The state court's findings that Butler's experiences earlier in life contradict his alleged deficits in this area are sufficient to justify discounting Butler's responses to the court and to Dr. Denkowski.  Butler's claimed impairments in his ability to communicate are not consistent with the evidence of his ability to communicate earlier in life.

Butler acknowledges that the record shows that he "could at times understand and process information and engage in logical reasoning."  He points to a statement by the AAMR noting that mentally retarded people "are complex human beings who likely have certain gifts as well as limitations. . . . Individuals may have capabilities and strengths that are independent of their mental retardation."  AAMR Manual at 1 (quoted by Am. Pet. at 78).  While this statement allows for the possibility that an individual may

---

[10]See, e.g., Am. Pet. at 2-3 (arguing that Butler was incompetent to stand trial due, in part, to mental illness); id. at 93-104 (arguing that trial counsel rendered ineffective assistance by not developing evidence that Butler was incompetent to stand trial due to mental illness).

have significant deficits in some areas of adaptive functioning even while functioning at or near a normal level in other areas, nothing in the language quoted suggests that strengths and weaknesses in a given area come and go.  If, as the state court found and the record supports, Butler demonstrated strengths in some of these areas as a youth and when engaging in criminal conduct, evidence that he has significant deficits in these areas as an adult may reasonably be attributed to causes other than mental retardation, such as malingering.

(a)  <u>Functional Academics</u>

Butler points to the results of two standardized measures of adaptive behavior -- the Vineland Adaptive Behavior Scales and the Independent Living Scales ("ILS") -- administered by Dr. Keyes. For the Vineland, Dr. Keyes interviewed Barbara Buie and Anthony Minor, two people who knew Butler well both during and after his developmental period.  Butler contends that these scales demonstrate that he has deficits in (a) checking for correct change after making a purchase -- on a scale of 0 to 2, where 0=never, 1=sometimes, and 2=usually or always, Buie gave Butler a 0 and Minor gave him a 1 for this item; (b) budgeting money for a week -- Buie gave Butler a 0 for this item and for managing money without assistance; (c) balancing a checkbook -- both Buie and Minor gave Butler a 0, and Butler was unable to perform this task when asked to do so on the ILS; (d) using a dictionary or encyclopedia -- Buie

-38-

gave Butler a 0 and Minor gave him a 1 for using a dictionary. Butler could not distinguish between a dictionary and an encyclopedia in his interview with Dr. Denkowski; (e) reading and obeying common signs -- Minor gave Butler a 0; and (f) going to the library and checking out books or using reference materials -- both Buie and Minor gave Butler a 0.  Cynthia Minor also reported that Butler did not know what to do in the library during a history class that required research.  See Def. Exhs. 13, 17; 2 WH at 42-45.

Butler also states that during the writ hearing Anthony Minor testified that Butler needed help with job and housing applications.  3 WH 17-18, 30.  Butler's characterization of Minor's testimony is not entirely accurate.  Minor testified that he helped Butler with these applications, but not that Butler could not complete them without help.

Butler also points out that when he bought a car Anthony Minor checked the classified ads and located the car.  This statement is true, but leaves out the fact that Minor had the greater motivation to find Butler a car.  Minor testified that he had been driving Butler to work but found this responsibility burdensome.  He therefore checked the classified ads to find a car for Butler to buy.  3 WH at 19-20.  At trial, Butler's father testified that Butler had a driver's license and drove a car.  21 Tr. at 934.[11]

---

[11]"Tr." refers to the transcript of Butler's trial.

Butler also claims that he found jobs through Minor's efforts rather than his own, but the record does not support this.  Minor testified that:  "He [Butler] met someone who was working at AMF Tubascope . . . .  And he brought an application home and we worked on that.  3 WH at 17.  Minor further explained that Butler heard about the job from someone Butler knew.  Id. at 18-19.

Butler also challenges the state court's finding that he could correctly add the prices of items ordered from the commissary.  Dr. Keyes testified that marks on the commissary slips indicated that Butler was using a device commonly used by mentally retarded people to add.  Rather than adding the numbers, he marked lines to represent each column and then added the lines.  5 WH at 91-92.  The evidence shows, however, that Butler not only added these items correctly, but also managed to avoid overdrawing his account or exceeding limits on the number of items he was permitted to order.  In sum, the Vineland results are highly questionable when compared with the trial testimony of Buie and Minor and with other evidence of Butler's abilities.[12]

Dr. Keyes acknowledged that the ILS test was designed for people over 65 to determine if they needed 24-hour care; that it is not commonly used to diagnose mental retardation; and that many of Butler's answers were correct and that other answers -- although

_____

[12]For example, Minor told Dr. Keyes that Butler never watched the news while Butler testified that he watched the news of one of his crimes and acted in response to avoid detection.  5 WH at 192-193.

not scored as correct -- were probably acceptable to most people, especially since many of the correct answers assumed that the person being scored was an older homeowner, not a younger person whose only expense had been in renting apartments and who had been incarcerated for many years.  5 WH at 199-211, 245-246, 250.

Butler's claims that he has extremely poor reading skills are also questionable in light of the publications found in his death row cell.  These included several magazines addressed to Butler, suggesting that Butler subscribed to them.

The court concludes that the state court acted well within its discretion in rejecting Dr. Keyes' Vineland test results and his opinions that Butler had deficits in adaptive behavior.  See ¶¶ 151 and 153 at 950-51.  The court has read the transcript of the writ hearing and reviewed the exhibits admitted before the state court. Although Dr. Keyes said what Butler attributes to him, Dr. Keyes testified as an advocate for Butler; not as an objective expert on mental retardation.  He often tried to minimize or discount testimony that did not support his opinion.

To give but a few examples, Butler's father testified that Butler was trustworthy, that he helped neighbors, including shopping for them at the grocery store and running errands, that he was active in the community, could drive, and was a good person. (See, e.g., ¶¶ 101 and 110 at 938, 940.)  Dr. Keyes characterized all of Butler's father's testimony as "[r]ose-colored glasses." (5 WH at 131) and concluded that Butler's father "probably didn't

know his son very well." Id. at 132.  Although Butler's father frequently traveled and was not at home as often as Butler's mother, there is no basis for disregarding all of his testimony. Both Butler's counsel and respondent's counsel questioned Dr. Keyes in some detail about facts surrounding several of Butler's crimes, which showed that he planned the crimes and engaged in fairly complex behavior to avoid detection.  Dr. Keyes concluded that all of these abilities were "within the range of mental retardation," 5 WH 133, or due to "common sense," id. at 134, or based on Butler's admitted strength and planning skills notwithstanding his mental retardation, id. at 135.  Dr. Keyes also discounted Butler's ability to testify in a detailed, coherent narrative fashion at his trial, id. at 136, and to recount tales of previous crimes, as due either "to the fact that he had been very carefully coached on what to say," id. at 137,[13] or to the fact that those events constituted "a particularly dramatic moment in his life [that he might remember . . . .  Id. at 137.  After being questioned by respondent's counsel about a series of activities by Butler that were inconsistent with deficits in adaptive behavior, Dr. Keyes was forced to admit that Butler was capable of reasoned thinking, id. at 184-191, and was able to adapt, at least in a criminal setting, because he understood the consequences of his criminal behavior.

---

[13]The ability to retain coaching, if true, would be inconsistent with Dr. Keyes' opinion that Butler was deficient in short-term memory.

Id. at 192-193.  Although Dr. Keyes was qualified as an expert by education and experience, the adversarial slant to his testimony gave the state trial judge ample reasons to reject many of his conclusions.

This court concludes that the state court's findings that Butler does not have a significant deficit in functional academics were reasonable.

### (b)  Communications

Several witnesses who knew Butler during his developmental period testified that Butler was shy and quiet and rarely initiated conversation.  He sometimes spoke with unusual sentence structure and grammar and demonstrated a very limited vocabulary.  He often used one-word phrases and sentences to communicate.  One friend testified that Butler had difficulty understanding things and often needed things repeated.  See Def. Exh. 15; 3 WH at 10, 52, 59-60, 117, 124-25.

Dr. Keyes also testified that Butler had trouble communicating.  5 WH at 123.  Dr. Denkowski testified that Butler was not spontaneous in conversation and was quiet.  6 WH at 67. Butler contends that this is borne out by the videotapes and transcripts of Dr. Denkowski's interviews with him.  Def. Exhs. 13 and 14.

Dr. Kathleen Fahey, a speech and language pathologist at the University of Northern Colorado who specializes in language

disabilities and adolescent language development, reviewed the transcript of Butler's testimony in his sexual assault case in Chambers County.  She concluded that his speech was very consistent with the speech of an adult with mental retardation.  6 WH at 4-29. Dr. Keyes agreed that Butler's language skills were consistent with his experience of mentally retarded people.  7 WH at 244.

Other evidence, however, showed that Butler visited with and helped friends and neighbors as a youth, wrote coherently to his commanding officer in the National Guard,[14] communicated with the police, communicated with and gave instructions to the victims of his crimes, and testified coherently and in some detail at his trial.  In light of evidence that Butler could communicate ably when he wanted to, he has not borne his burden of proving by clear and convincing evidence that the state court's findings were unreasonable.

### (2)  Social Skills

Witnesses who knew Butler during his developmental period described him as shy and withdrawn.  See, e.g., 2 WH at 10.  Other students made fun of Butler in school.  He was a follower, not a leader.  Id. at 17-18.

Witnesses testified that Butler was unskilled and awkward when playing sports, although Butler's father testified that Butler was

---

[14]State's Exh. 9; October 10, 1982, letter from Butler to Captain Hill.

a good athlete.  Walter Washington testified that Butler sometimes ran the wrong way when playing football.  When playing basketball, Butler sometimes took wild shots, then ran the other way without waiting to see if he made the shot or without trying for the rebound.  He had trouble following strategy.  Id. at 13-16.

Witnesses testified that Butler could not resolve conflicts. Terry Butler, Sr. testified that Butler got frustrated and walked away if there was a conflict.  Def. Exh. 15.  Jerlian King testified that Butler walked away if an argument broke out during a game.  4 WH at 11-12.

Friends testified that Butler had trouble understanding jokes. Sometimes he failed to laugh at a joke only to get it sometime later and begin laughing inappropriately.  Def. Exh. 15 (W. Washington Declaration).

Butler's ex-fiancee, Amanda O'Quinn, testified that he once brought her over to another girl's house.  Once there, she figured out that the other girl was interested in Butler, and Butler brought O'Quinn to show the other girl that he had a girlfriend. One Christmas Butler gave O'Quinn what appeared to be an engagement ring, even though they had not discussed marriage.  She asked him what the gift was for, and he would not tell her.  She later learned from Butler's friends and her mother that it was an engagement ring.  Butler maintained a three-year relationship with O'Quinn.  3 WH at 120-43.

Trial testimony by Butler's parents, however, weighs against a finding of limitations in this area.  Both of Butler's parents testified that Butler was a normal young man who was active in the community, ran errands and shopped for people, and did average things that boys did.  Friends and neighbors testified at his criminal trial that Butler would stop by and visit when he came to town.  7 WH 206-209, State Exhs. 23 and 24.

While the evidence demonstrates some social awkwardness, it also shows that Butler dated and formed and maintained friendships, some of which lasted many years.  While there is also evidence to the contrary, the state court's conclusion that Butler does not have a significant deficit in the realm of social functioning was not unreasonable.

### (3)  Practical Skills

At the suggestion of his friend, Anthony Minor, Butler moved to Texas to find work.  3 WH at 7, 16-18.  Butler lived at Minor's apartment for several months.  Minor described Butler as very messy and stated that he would only clean up when Minor asked him to do so.  Id. at 21.  Butler did not cook, but ate only foods requiring little preparation, such as cereal, cold cuts, and frozen pot pies.  The one time Minor saw Butler try to cook something, Butler ruined the food and smoked up his apartment.  Id. at 22-23.  Butler did not do his own laundry.  Instead, he dropped his laundry off at a laundromat for laundering and folding.  Id. at 23-24.  When going

-46-

out to eat, Butler never ordered on his own, instead, telling Minor to "[g]et me what you're getting." Id. at 24.

Eventually, Minor helped Butler find his own apartment. Minor looked for an apartment that Butler could afford. He found an apartment about a half mile from his own, so that he could check in on Butler. Id. at 24-26.

Butler was evicted from his apartment after a few months, and Minor helped him get another apartment. Minor checked in on Butler two to three times per week. Id. at 38-40. Minor and his wife helped Butler pick out furniture for his apartment and co-signed for credit to purchase the furniture. Eventually, Butler defaulted. Id. at 26-28.

Barbara Buie testified that Butler had the same habit of ordering what his friends ordered at restaurants when he was a teenager. He also mistakenly thought his birthday was April 10 when it is, in fact, April 5. Id. at 78-85. Similarly, Amanda O'Quinn testified that she always ordered for both of them at fast food restaurants, even when they went through the drive-through and she was in the passenger seat. Id. at 144.

Buie and Butler were both in a work program at school. The program provided students with jobs after school, on weekends, and in the summer. Buie's jobs included helping teachers grade papers, putting up a bulletin board, inventorying books, and other classroom duties. Id. at 86-87. Butler's only job was cleaning

-47-

halls and classrooms with a dust mop.  Id. at 88.  Butler was also frequently late for work.  Id. at 125.

Amanda O'Quinn observed that Butler's mother did everything for him at home.  She bought, washed, and ironed his clothes, and prepared his food.  Id. at 141-42.  Jerlian King described Butler's mother as very protective of Butler and stated that she treated Butler differently than his sisters.  4 WH at 13-14.

The record also establishes, however, that Butler spent time in the Job Corps and obtained work as a plumber after completing Job Corps.  21 Tr. at 948-50.  He also, as the state court found, formulated plans to commit crimes when there was likely to be a large amount of cash on the premises and no customers present and to carry out the crimes after he planned them.

In sum, the evidence shows that he sought and obtained jobs, bought a car with money he saved, provided food for himself, lived on his own, and planned and committed crimes.  While the evidence also establishes that Butler has some difficulties in this area, the state court's conclusion that Butler does not have significant deficits in the area of practical functioning was not unreasonable.

### (4)  Assessments of Butler's Adaptive Behavior

Dr. Denkowski administered the ABAS and determined, based on Butler's self-reporting, that Butler's adaptive functioning is average, with no deficits.  Dr. Keyes administered the Vineland Adaptive Behavior Scales and the Independent Living Scales ("ILS")

tests and concluded that Butler's adaptive functioning is in the bottom two percent of the population.  The Vineland is based on reporting by people who know or knew Butler, and the ILS actually tests Butler's abilities by requiring him to perform certain tasks, such as looking up a phone number or writing a check.

The state court declined to consider the results of any of the standardized instruments used by the experts to assess Butler's adaptive behavior.  The state court found unpersuasive Dr. Keyes' opinions regarding deficits in Butler's adaptive behavior based on the Vineland test.  ¶¶ 150 and 151 at 950.  The court did not consider Dr. Denkowski's ABAS findings or Dr. Keyes' ILS findings because neither test was designed to determine the abilities of someone who has been incarcerated for a substantial length of time. ¶ 153 at 951.  Butler now argues that the state court erred and that Dr. Keyes' testing paints an accurate picture of his adaptive functioning.

Butler's only response to the state court's rejection of Dr. Keyes' Vineland and ILS findings is that the Vineland and ILS results are consistent with each other and with the testimony of witnesses who knew Butler and with other evidence in the record. As explained above, however, there was ample evidence that Dr. Keyes' test results did not accurately reflect Butler's abilities and that his opinions were heavily biased in favor of Butler.  The state trial court was well within its discretion in discounting this evidence.

### 3.   Onset Before Age 18

Because the state court found that Butler had neither significantly sub-average intellectual functioning nor deficits in adaptive behavior, the court found that he had failed to show either sub-average intellectual functioning or deficits in adaptive behavior during the developmental period.   ¶¶ 165-168, IV SH at 954.   The state court's findings as to onset are not unreasonable in light of the record.

### 4.   Conclusion

The state court's findings that Butler lacked significantly sub-average general intellectual functioning before 18 are not clearly unreasonable, and the state court's findings that Butler does not suffer significant deficits in adaptive behavior are reasonably supported by the record.   Therefore, the state court's ultimate conclusion that Butler is not mentally retarded was reasonable.   Accordingly, under the AEDPA standards Butler is not entitled to relief on this claim.

## C.   Procedurally Defaulted Claims

The Texas Court of Criminal Appeals dismissed all of Butler's allegations except his Atkins claim.   The court held that "[t]he remaining allegations do not satisfy an exception [to Tex. Code Crim. Proc. art. 11.071 § 5(a)] and are dismissed as an abuse of the writ."   Ex parte Butler, No. 41,121-02, at page 2 (Tex. Crim.

-50-

App. Sept. 15, 2004).  Respondent argues that claims two through six are procedurally defaulted.  The procedural default doctrine may bar federal review of a claim.  "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment."  Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir. 2001).  The Supreme Court has noted that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750 (1991).  "This doctrine ensures that federal courts give proper respect to state procedural rules."  Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997) (citing Coleman, 501 U.S. at 750-51), cert. denied, 523 U.S. 1125 (1998); see also Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed."  Ford v. Georgia, 498 U.S. 411, 424 (1991).  If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may go to the merits of

-51-

the claim.  Barr v. Columbia, 378 U.S. 146, 149 (1964).  An important consideration in determining whether an "adequate" state law ground exists is the application of the state law ground to identical or similar claims.  Amos v. Scott, 61 F.3d 333, 340-41 (5th Cir.), cert. denied, 516 U.S. 1005 (1995).  The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question.  Howlett v. Rose, 496 U.S. 356, 366 (1990).

Butler concedes that he did not raise his second through sixth claims in his first state habeas application, and that the TCCA dismissed these claims as an abuse of the writ in his second application.  He argues, however, that the Texas abuse of the writ doctrine contains two elements:  (1) failure to demonstrate that the factual or legal basis of the claim was unavailable at the time the original application was filed and (2) failure to plead sufficient specific facts which, if true, would entitle the petitioner to habeas relief.  Butler argues that because the TCCA did not expressly state that it relied on the first prong, its dismissal on abuse of the writ grounds was not an unambiguous reliance on an independent and adequate state procedural ground because it might have involved a determination that Butler simply failed to demonstrate that he was entitled to relief, i.e., it was a determination on the merits.  As one of the cases cited by Butler makes clear, however, this argument does not withstand scrutiny.

In Ex parte Staley, 160 S.W.3d 56 (Tex. Crim. App. 2005), the TCCA discussed these two prongs.  That opinion makes clear that the requirement that a petitioner plead sufficient specific facts which, if proven true, would entitle the petitioner to relief, is a threshold pleading requirement and is not dependent on a merits determination.   Indeed, the court made clear that unless a petitioner satisfied this threshold pleading requirement, a state court is prohibited from addressing the merits of the claim.

> Neither we nor the trial court can consider the merits of [a] claim unless we first find that applicant's current application "contains sufficient specific facts establishing" that his claim is both cognizable under current constitutional law and was legally "unavailable" at the time he filed his original writ.

Id. at 61.  Therefore, the TCCA's reliance on the abuse of the writ statute, rather than a specific statement of reliance on Butler's failure to raise the claims in his first petition, does not create any ambiguity as to the court's reliance on an independent and adequate state procedural bar.  The TCCA concluded that the claims were barred because Butler failed to raise them in his first application, failed to plead his claims with sufficient specificity, or both.  Neither basis requires a determination on the merits of the claims.  Butler's failure to satisfy at least one of these prongs in a successive petition bars review of the merits.  Thus, this court can address claims two through six only if Butler can demonstrate cause for his defaults and prejudice flowing from

them or that this court's failure to consider the claims would result in a fundamental miscarriage of justice.

1.  Cause

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule or a showing of a prior determination of ineffective assistance of counsel.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Amadeo v. Zant, 486 U.S. 214, 222 (1988).  Butler contends that he was mentally incompetent at the time he filed his first state habeas petition and that his alleged incompetence constitutes cause for any procedural default. He also argues, in connection with his Brady claim (Claim Four), that the state's alleged suppression of material exculpatory evidence constitutes cause.

a.   Incompetence

Butler offers much argument, and some evidence, that he is mentally ill.  Being mentally ill, however, does not necessarily make one incompetent.  Butler's amended petition raised the possibility that he is incompetent and states that a motion to determine his competency might follow.  There is no indication that Butler ever filed such a motion.

In any event, Butler's mental state is not a factor external to the defense that impeded counsel's ability to comply with the state procedural rules.  See Murray v. Carrier, 477 U.S. 478

-54-

(1986).  "Something that comes from a source within the petitioner is unlikely to qualify as an external impediment."  Corcoran v. Buss, 483 F.Supp.2d 709, 728 (N.D. Ind. 2007).

The cases cited by Butler do not support his argument.  Holt v. Bowersox, 191 F.3d 970 (8th Cir. 1999), is distinguishable.  In Holt the petitioner did not have counsel.  Butler had counsel in his state habeas proceeding.  Therefore, Butler, unlike Holt, had someone who was mentally competent and familiar with the law pursuing his claims.

Butler also cites Rumbaugh v. Procunier, 753 F.2d 395 (5th Cir. 1985), for the proposition that a mentally incompetent individual cannot waive his right to seek post-conviction relief.  Rumbaugh, however, does not support Butler's argument that incompetence constitutes cause for a default.

In Rumbaugh the petitioner elected not to pursue post-conviction relief.  His parents, claiming that the petitioner was mentally incompetent, sought standing to pursue relief on the petitioner's behalf as his next friends.  Id. at 396-98.  The court ruled that the parents could do so if their son was, in fact, incompetent.

In contrast to Rumbaugh, Butler did not abandon or refuse to pursue post-conviction relief.  Butler, through counsel, filed two state habeas corpus applications raising numerous claims for relief.  He now complains because his original state habeas counsel did not raise five new claims he wishes to raise in this court.

-55-

That, however, is not an argument about mental incompetence; it is an argument that his original state habeas counsel rendered ineffective assistance.

It is well-established that there is no constitutional right to counsel in a post-conviction proceeding. "States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." Pennsylvania v. Finley, 481 U.S. 551, 557 (1987) (citation omitted). For this reason Butler has no right to effective assistance of post-conviction counsel, id. at 557-58, and ineffective assistance of post-conviction counsel cannot constitute cause for a procedural default.

> There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings . . . [Petitioner] must bear the risk of attorney error that results in a procedural default.

Coleman v. Thompson, 501 U.S. 722, 752-53 (1991) (citations and internal quotation marks omitted); see also Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001) ("ineffective assistance of habeas counsel cannot provide cause for a procedural default"), cert. denied sub nom. Martinez v. Cockrell, 534 U.S. 1163 (2002).

Butler also argues that the state court's alleged failure to appoint competent counsel means that there was no effective state process for him to pursue post-conviction relief. If this argument

-56-

is correct, it could bring the claim within a catch-all exception to the exhaustion requirement.  See 28 U.S.C. § 2254(b)(2)(B)(ii). The Fifth Circuit, however, has already rejected the argument that incompetent state habeas counsel can bring a case within the ambit of § 2254(b)(2)(B)(ii).  See Martinez v. Johnson, 255 F.3d 229, 239 n.10 (5th Cir. 2001).

>        b.    Suppression of Evidence

Butler argues that the state's alleged suppression of evidence giving rise to his Brady claim also constitutes cause for his procedural default of that claim.  Butler concedes, however, that he obtained the allegedly suppressed evidence in connection with this federal habeas proceeding through open records act requests. See Resp. to Motion for Summary Judgment (Docket Entry No. 25) at 63.    Thus,   the   record   indicates   that   this   information   was available,   at   least   during   post-conviction   proceedings,   upon request.   Butler presents no evidence, however, that he made any such effort to obtain this information during his state habeas proceedings.   In the Brady context evidence is not "suppressed" if the defendant can discover it through the exercise of reasonable diligence.  See Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997), cert. denied, 522 U.S. 1120 (1998).  The same principle must hold true in the procedural default context.  Otherwise, a showing that evidence was suppressed at trial would excuse every procedural default following that trial regardless of whether the petitioner

could have easily discovered the evidence with some minimal effort. Accordingly, Butler fails to demonstrate cause for his procedural default of claims two through six.

>    2.   Miscarriage of Justice

A "miscarriage of justice" means actual innocence, either of the crime for which Butler was convicted or of the death penalty. Sawyer v. Whitley, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, Butler would not have been legally eligible for a sentence of death. Id. Butler makes no claim that he is actually innocent. Therefore, the miscarriage of justice exception to the procedural default rule is inapplicable. Because Butler fails to demonstrate cause for his procedural defaults, this court cannot address these claims for relief.

**D.  *Batson***

In his seventh claim for relief Butler argues that his rights under Batson v. Kentucky, 476 U.S. 79 (1986), were violated when the prosecution exercised a peremptory challenge based on the race of the prospective juror.   The trial court sustained Butler's Batson objection and implemented a remedy.   Butler's claim objects not to the Batson violation itself, but to the remedy chosen by the trial court.

The trial court divided the venire into "mini-panels" of six to twelve venire members for purposes of voir dire.   Upon

sustaining Butler's <u>Batson</u> objection, the trial court dismissed the eight-person mini-panel that included the improperly struck venire member and returned the peremptory challenge to the state.   Three previously selected white jurors remained on the jury.   The Texas Court of Criminal Appeals affirmed the trial court's decision in <u>Butler v. State</u>, 872 S.W.2d 227 (1994).

Relying on a footnote in <u>Batson</u>, Butler argues that this was an unreasonable interpretation of <u>Batson</u>.

Near the end of its opinion, the <u>Batson</u> Court stated:

> [W]e express no view on whether it is more appropriate in a particular case, upon a find-ing of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case . . . or to disallow the discriminatory challenges and resume selection with the improperly chal-lenged juror reinstated on the venire . . . .

<u>Batson</u>, 476 U.S. at 99 n.24 (citations omitted).   From this language Butler argues that dismissing the entire venire or reinstating the improperly struck juror are the <u>only</u> permissible remedies under <u>Batson</u>.

Butler's argument ignores the first sentence of footnote 24: "In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today."   <u>Id.</u> Perhaps there is merit to Butler's argument that the trial court's chosen remedy failed to address the actual harm to Butler or the system as a whole by leaving the improperly challenged juror off

the panel and not depriving the state of a peremptory strike.  The question under the AEDPA, however, is not whether Butler's argument makes sense, but whether the state court's resolution of the issue was an unreasonable application of Supreme Court precedent.  While Butler is correct that the prospective juror was left off the panel, he ignores the fact that the rest of the mini-panel, which presumably included white prospective jurors, was also dismissed, reducing the number of prospective white jurors available to the state.  While the remedy chosen by the trial court may not have been ideal, the trial court's <u>Batson</u> remedy was not "so patently incorrect as to be 'unreasonable.'"  <u>Gardner v. Johnson</u>, 247 F.3d 551, 560 (5th Cir. 2001).  Therefore, in the procedural posture in which this case now sits, Butler is not entitled to relief.

**E.   Withdrawn Claims**

Butler's Amended Petition raises 10 claims for relief, but his answer to the summary judgment motion withdraws claims 8-10.  Therefore, these claims are no longer before the court.

## IV.  <u>Certificate of Appealability</u>

Butler has not requested a certificate of appealability ("COA"), but this court may determine whether he is entitled to this relief in light of the foregoing rulings.  <u>See</u> <u>Alexander v. Johnson</u>, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA <u>sua sponte</u>.  The statute does not require that a petitioner move for a COA; it merely states

that an appeal may not be taken without a certificate of appealability having been issued."). A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir.), cert. denied, 531 U.S. 966 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), cert. dismissed, 531 U.S. 1134 (2001).

The statute provides that the certificate "shall indicate which specific issue or issues satisfy the showing required by

paragraph (2)." 28 U.S.C. § 2253(c)(3).  The court has carefully considered each of Butler's claims and concludes that, with the exception of the issue of whether Butler had sub-average general intellectual function before age 18, which is an element of his First Claim for Relief, each of his claims is foreclosed by clear, binding precedent.  The court concludes that as to those claims Butler has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The court will grant a certificate of appealability as to Butler's First Claim for Relief.

### V.  Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.    Respondent Nathaniel Quarterman's Motion for Summary Judgment(Docket Entry No. 15) is **GRANTED**;

2.    Petitioner Steven Anthony Butler's Amended Petition for a Writ of Habeas Corpus (Docket Entry No. 9) is **DENIED**, and Butler's Amended Petition is **DISMISSED with prejudice**; and

3.    A Certificate of Appealability shall issue as to Butler's First Claim for Relief and is **DENIED** as to all of his other claims.

**SIGNED** at Houston, Texas, on this 4th day of September, 2008.

_____
                    SIM LAKE
            UNITED STATES DISTRICT JUDGE